UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CROWN ENTERPRISES, INC., LAKESHORE
DISTRIBUTION, LLC, and HUBER-
MANCHESTER INVESTMENTS, LLC,

        Plaintiffs,

v.                                                    Case No. 07-14842
                                                      Honorable Patrick J. Duggan

EQUITY INDUSTRIAL PARTNERS CORP.,
DONALD LEVINE, and BRUCE LEVINE,

        Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on May 29, 2008.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                U.S. DISTRICT COURT JUDGE

Plaintiffs filed this diversity lawsuit on November 9, 2007, after a real estate

transaction between Plaintiffs and Defendant Equity Industrial Partners Corporation

("EIPC") failed to close.  In their first amended complaint, Plaintiffs allege the following

counts: (I) fraud in violation of the Massachusetts Deceptive Trade Practices Act ("Act");

(II) breach of good faith and fair dealing in violation of the Act; (III) fraud; and (IV)

breach of contract.  Plaintiffs allege Counts I through III against all Defendants and Count

IV against EIPC, only.  Presently before the Court is Defendants' motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6).  The motion has been fully briefed

and this Court held a motion hearing on May 1, 2008.

## I.      Standard for a Motion to Dismiss

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proved, would entitle him to relief. *First Am. Title Co. v. DeVaugh*, 480 F.3d 438, 443 (6th Cir. 2007). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). Reviewing a motion to dismiss ". . . the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Bledsoe v. Community Health Sys.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombley*, – U.S. – , 127 S. Ct 1955, 1974 (2007)). "Under general pleading standards, the facts alleged in the complaint need not be detailed, although 'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" *Id*. (quoting *Twombley*, 127 S. Ct. at 1964-65).

## II.     Factual Background

Plaintiffs are Michigan entities having their principal places of business in Macomb County, Michigan. EIPC is a Massachusetts corporation. Defendants Donald Levine and Bruce Levine are residents of Massachusetts and officers of EIPC.

2

In early 2007, Plaintiffs offered five parcels of developed, commercial/industrial property for sale as a portfolio group ("Portfolio"). Two of the properties were located in Michigan, one property was located in Tennessee, one property was located in Indiana, and the fifth property was located in Louisiana. Plaintiffs set a single price for the Portfolio, as they intended to wholly divest themselves of the Portfolio and identify the properties as "reverse exchange" properties under section 1031 of the Internal Revenue Code. Under the Code, if an entity purchases real estate, then within 45 days from the purchase, they must designate certain other "like-kind exchange" properties which they intend to sell to delay certain federal tax consequences which would otherwise be associated with any gain on the sale. To take advantage of the reverse 1031 exchange, the party having identified the properties to be sold must also close on the sale within 180 days.

EIPC thereafter submitted a letter of intent offering to purchase the Portfolio. While Plaintiffs received letters of intent from other prospective purchasers offering higher purchase prices than EIPC, Plaintiffs focused on EIPC's offer because it expressed a quicker closing date. During subsequent negotiations, Plaintiffs claim that EIPC's broker and attorneys consistently represented to Plaintiffs that EIPC was more than capable and willing to quickly acquire the Portfolio, that EIPC was a commercially sophisticated real estate investment company, and that EIPC had the present ability and intent to purchase the Portfolio.

On April 23, 2007, Plaintiffs and EIPC entered into a "Purchase and Sale

Agreement" ("Purchase Agreement"). The Purchase Agreement provided for the following: a purchase price for the Portfolio of Eighty One Million Five Hundred Thousand Dollars ($81,500,000); a forty-five day "Inspection Period"; and a closing date within 30 days of the expiration of the Inspection Period. Additionally, EIPC was obligated to deposit one hundred thousand dollars ($100,000) with an escrow agent within three days of the execution of the Purchase Agreement and an additional one hundred thousand dollars ($100,000) upon expiration of the Inspection Period (provided EIPC did not terminate the agreement during that period).

Plaintiffs contend that despite Defendants' representations at the time, EIPC did not intend to close quickly. Instead, Plaintiffs claim, Defendants intended to string out the sale so as to pressure Plaintiffs to sell the most profitable properties in the Portfolio and to sell those properties at a reduced price. According to Plaintiffs, Defendants' "*modus operandi* was to seek distressed properties from desperate sellers, and to acquire properties at bargain basement discounts." (Compl. ¶ 45.)

In fact, one month after execution of the Purchase Agreement, EIPC requested a price reduction on the property in Indiana. When Plaintiffs refused, EIPC requested an extension of the Inspection Period. The parties subsequently agreed to extend the Inspection Period until mid-June 2007. As that deadline approached, however, EIPC started raising additional issues, which Plaintiffs contend was done to further delay the closing. After the Inspection Period was extended a second time, EIPC demanded more land at each property for no additional cost. When Plaintiffs refused, Defendants

terminated the Purchase Agreement on July 30, 2007.

Plaintiffs subsequently offered to give additional land to EIPC at one of the properties, only, at no additional price increase. Negotiations ensued between Plaintiffs and EIPC and, on October 1, 2007, they entered into a "Letter Agreement," which reinstated the Purchase Agreement with the following amendments: removal of the Indiana and Louisiana properties from the Portfolio; the addition of land to one of the Michigan properties; and a reduced purchase price of seventy one million two hundred eighty five thousand dollars ($71,285,000) ("Final Letter Agreement"). The Final Letter Agreement further provided that "[t]he closing shall take place on or before October 19, 2007."

Four days after the Final Letter Agreement was signed, however, EIPC informed Plaintiffs that it would be unable to close by October 19 due to problems with its lender. EIPC represented that its lender indicated that closing could occur by November 9, 2007. The parties thereafter executed an amendment extending the closing date to November 9, 2007; but three days before that amended closing date, Defendants informed Plaintiffs' broker that EIPC would not close unless Plaintiffs reduced the purchase price by another million dollars or removed one of the Michigan properties from the agreement and provided additional land on the Tennessee property.

Plaintiffs then filed this lawsuit.

## III.     Applicable Law and Analysis

### A.     Plaintiffs' Claims Under the Massachusetts Deceptive Trade Practices

5

**Act (Counts I and II)**

Defendants raise several arguments for why they believe Plaintiffs' claims under the Massachusetts Deceptive Trade Practices Act fail. First, Defendants argue that Michigan and not Massachusetts law controls. Second, even if Massachusetts law controls, Defendants contend that the Act only applies if the alleged wrongful conduct "occurred primarily and substantially within the commonwealth" and, they argue, the conduct involved in this lawsuit occurred elsewhere– specifically in Michigan. Third, as to Plaintiffs' breach of good faith and fair dealing claim under the Act (Count II), Defendants argue that the alleged wrongful conduct does not, as a matter of law, attain the "level of rascality" that is necessary to violate the Act.

### 1) Whether Michigan or Massachusetts Law Governs Plaintiffs' Non-Contract Claims

The Purchase Agreement between Plaintiffs and EIPC contains the following choice of law provision:

> Issues arising under this Agreement which do not relate to an Individual Real Property shall be construed under and in accordance with the laws of the Commonwealth of Massachusetts. Issues arising under this Agreement which relate specifically to an Individual Real Property shall be construed under and in accordance with the laws of the State where such Individual Real Property is located.

(Defs.' Mot., Ex. A at 21.) As an initial matter, Defendants contend that the second clause and not the first clause of the parties' choice of law provision applies to the pending lawsuit. Plaintiffs' claims, however, arise from Defendants' conduct in relation

6

to the parties' entire agreement– specifically Defendants delay of the closing date (which was for the Portfolio as a whole) and their motive for doing so. The dispute is not directed at an issue involving any specific property within the Portfolio. Thus if the choice of law provision controls, the Court concludes that Massachusetts law governs.

To resolve whether this provision governs Plaintiffs' non-contract claims in this diversity action, the Court must resolve two questions. *See Banek, Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357 (6th Cir. 1993). First, is the provision enforceable under the forum's choice of law rules. *Id*. at 361. Second, does the provision govern all claims between the parties or only contract claims. *Id*. at 360, 363.

A federal court in a diversity case must apply the conflict of law rules of the forum state. *Id*. at 361; *see also Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941)). Thus Michigan's conflict of law rules determine whether Michigan or Massachusetts law governs in this case. The Sixth Circuit has set forth Michigan's conflict of law principles as follows:

> Michigan has adopted the approach articulated in 1 Restatement (Second) of Conflict of Laws § 187. . . . Under section 187, a contractual choice of law provision will govern unless either:
> 
> (a)    the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> 
> (b)    application of the law of the chosen state could be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the

> particular issue and which, under the rule of
> § 188, would be the state of the applicable law
> in the absence of an effective choice of law by
> the parties.

*Banek*, 6 F.3d at 361 (internal citations omitted).  The chosen state, Massachusetts, has a

substantial relationship to Defendants and Defendants do not suggest that application of

Massachusetts law would be contrary to a fundamental policy of Michigan or any other

state.  Thus the Court turns to the second question of whether the provision governs

Plaintiffs' non-contract claims.

Relying on the following unpublished Sixth Circuit decision and two Eastern

District of Michigan decisions, Defendants argue that the parties' choice of law provision

should not govern Plaintiffs' non-contract claims under this rule because the alleged

injury occurred in Michigan to Michigan entities: *Imaging Financial Services, Inc. v.

Eastman Kodak Co.*, No. 97-1930, 1999 WL 115473 (6th Cir. 1999) (unpublished

opinion); *LaSalle National Leasing Corp. v. Lyndecon*, 409 F. Supp. 2d 843 (E.D. Mich.

2005); and *Allmand Associates v. Hercules, Inc.*, 960 F. Supp. 1216 (E.D. Mich. 1997).

However, a published Sixth Circuit decision, which this Court must follow, dictates a

different result.

In *Watkins & Son Pet Supplies v. IAMS Company*, the court addressed whether

Michigan law– the law of the forum– governed the plaintiff's fraud claim and claim under

the Michigan Franchise Investment Law despite the choice of law provision in the

parties' contract which stated that Ohio law would govern their agreement. 254 F.3d 607,

610-11 (6th Cir. 2001). The court explained that "[u]nder Michigan law, a tort claim is governed by the law of the forum unless a 'rational reason' exists to displace it." *Id.* at 611 (quoting *Olmstead v. Anderson*, 428 Mich. 1, 29-30, 400 N.W.2d 292, 305 (1987)). The court found that the parties' choice of law provision provided a "sufficient reason" to displace Michigan law because the distinction was "so slight" between the plaintiff's claim for breach of contract and its fraud claim which alleged that the defendant made promises of future performance that it did not intend to keep. *Id.*

In reaching this result, the Sixth Circuit distinguished the tort claim before it from that in *Allmand* and *Imaging Financial Services*– two of the cases on which Plaintiffs rely here. *Id.* As the court explained:

> [I]n *Allmand* . . . and *Imaging Financial Services* . . ., the allegedly fraudulent misrepresentations were misrepresentations of fact that induced the plaintiff to enter a contract. In the instant case, on the other hand, the fraud alleged is promissory fraud: Watkins alleges that Iams made promises of future performance that it did not intend to keep. The distinction between such a claim and a claim for breach of contract is so slight that the parties' agreement that Ohio law would govern their agreement . . . is a sufficient reason to displace the law of Michigan and apply Ohio law to [the plaintiff's] fraud claim.

*Id.* The Sixth Circuit further distinguished *Allmand* based on the fact that the district court in that case concluded that Michigan law governed in part because the parties had agreed that Michigan law applied. *Id.* (citing *Allmand*, 960 F. Supp. at 1223 n.3).

Like *Watkins*, Plaintiffs allege in their fraud claim that Defendants "made promises of future performance that [they] did not intend to keep"– i.e., they represented that EIPC

had the means and desire to close the real estate transaction quickly when it did not intend

to do so.  Moreover, Plaintiffs and EIPC specifically agreed that Massachusetts law

governed their agreement.  Thus this Court finds *Watkins* controlling and concludes that

the parties' choice of law provision provides a sufficient reason to displace the law of

Michigan and apply Massachusetts law to Plaintiffs' non-contract claims.

> **2)**     **Whether the Alleged Wrongful Conduct "Occurred Primarily and Substantially Within the Commonwealth" As Required Under the Massachusetts Deceptive Trade Practices Act**

The Act provides: "No action shall be brought or maintained under this section

unless the actions and transactions constituting the alleged unfair method of competition

or the unfair or deceptive act or practice occurred *primarily or substantially* within the

commonwealth."  MASS. GEN. LAWS ch. 93A, § 11 (emphasis added).  The Act further

provides that the burden of proof with respect to this provision rests "upon the person

claiming that such transactions and actions did *not* occur primarily and substantially

within the commonwealth."  *Id*. (emphasis added).

In 2003, the Supreme Judicial Court of Massachusetts rejected a test based on a

particular set of factors to determine whether the actions and transactions occurred

primarily and substantially within the commonwealth:

> Whether the "actions and transactions . . . occurred primarily
> and substantially within the commonwealth" is not a
> determination that can be reduced to any precise formula.
> Significant factors that can be identified for one case may be
> nonexistent in another.  Any determination necessarily will be
> fact intensive and unique to each case. . . .
> In addition, it may, or may not, be appropriate to decide cases

> involving wrongful conduct in multiple jurisdictions based on
> which jurisdiction was the source of the most instances of
> misconduct. On the one hand, a single instance of misconduct
> in one jurisdiction may have greater significance for a case as
> a whole than a multiplicity of instances in another
> jurisdiction. On the other hand, the sheer number of instances
> of misconduct in one jurisdiction may produce the heft
> needed to resolve the question.

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798-99 (Mass.

2003). The Court advised judges to instead, "*after making findings of fact*"[1] and "after

considering those findings in the context of the entire § 11 claim," "determine whether

the center of gravity of the circumstances that give rise to the claim is primarily and

substantially within the commonwealth. *Id*. at 799 (emphasis added). Due to the fact

intensive nature of this inquiry, Massachusetts courts have held that it is premature to

decide on a motion to dismiss whether a claim occurred primarily and substantially in the

commonwealth. *See, e.g., Congress Fin. Corp. v. Kussell*, No. 035538BLS, 2005 WL

2010039, at *4 (Mass. Super. Ct. July 29, 2005) (denying the defendant's motion to

dismiss, concluding that "[o]n the present record, this Court cannot determine the locus of

the center of gravity of [the defendant's] action and, therefore, cannot determine whether

the matters that give rise to the claim against [the defendant] occurred primarily and

substantially within Massachusetts."); *Bliss Valley Properties, LLC v. Eliopulos*, No.

041100BLS, 2005 WL 1683749, at *6 (Mass. Super. Ct. June 2, 2005) ("While this Court

---

[1]Notably, the Supreme Judicial Court of Massachusetts has held that there is no
right to a jury trial on claims brought under the Deceptive and Unfair Trade Practices Act.
*Nei v. Burley*, 446 N.E.2d 674, 677-78 (Mass. 1983).

knows a lot about the *Kuwaiti Danish* case, it is not at all sure, but presumes from reading the [Supreme Judicial Court's] opinion, that this particular ground for challenging a [chapter] 93A claim– absent some extraordinary pleading concession by a claimant– cannot be resolved on Rule 12 motions"); *Gen. Motors Corp. v. Firepond, Inc.*, No. 014525, 2003 WL 21960673, at *5 (Mass. Super. Ct. July 3, 2003) (suggesting that it was premature to determine whether the alleged wrongful conduct occurred "primarily and substantially" in Massachusetts as discovery had not closed in the case).

In the present matter, Defendants did not file an answer to Plaintiffs' complaint but responded to the complaint with the pending motion to dismiss. No discovery has been conducted. Thus, at this juncture, the Court cannot make the factual findings that the *Kuwaiti Danish* Court advised that it must before determining where "the center of gravity of the circumstances that gave rise to the claim is primarily and substantially located." Further, in deciding Defendants' motion to dismiss, this Court must accept as true the factual allegations in Plaintiffs' complaint. Plaintiffs allege that Defendants engaged in misconduct in violation of the Act in that they misrepresented EIPC's ability and intent to close on the real estate sale. Plaintiffs also allege that Defendants are a Massachusetts corporation and Massachusetts residents. This suggests, at this time, that Defendants' misconduct occurred in whole or in part in the commonwealth. Until the facts are developed and presented, the Court cannot conclude otherwise.

3) **Whether Defendants' Conduct Meets the Level of "Rascality" Necessary to State a Claim for Breach of Good Faith and Fair Dealing in Violation of the Act**

Defendants contend that Count II of Plaintiffs' complaint fails because the misconduct Plaintiffs allege, even if true, does not attain the "level of rascality" necessary to violate the Act. As the Supreme Judicial Court of Massachusetts recently reiterated: "To prevail on a claim under [Massachusetts General Law chapter] 93A, the plaintiff must demonstrate an unfair or deceptive act or practice . . ., i.e., one that falls "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Lambert v. Fleet Nat'l Bank*, 865 N.E.2d 1091, 1097 (Mass. 2007) (quoting *Wasserman v. Agnastopoulos*, 22 Mass App. Ct. 672, 679, 497 N.E.2d 19 (1986)). The Court also has indicated that the crucial factors in determining whether the act or practice violates the Act are "the nature of the challenged conduct and the purpose and effect of that conduct." *Mass. Employers Ins. Exchange v. Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995).

Based on this language, federal courts have concluded that a simple breach of contract generally does not give rise to a violation of the Act. *See, e.g., Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998) ("We emphasize that this case did not involve a good faith dispute over billing or a simple breach of contract, each of which is an insufficient basis for 93A liability.") Those courts have further found, however, "that 'conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for [chapter] 93A purposes.'" *Id.* (quoting *Anthony's Pier Four, Inc. v. HBC Assoc.*, 583 N.E.2d 806, 821

(1991)); *see also Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17-19

(1st Cir. 1985) (finding a violation of the Act where the defendant withheld payment as a

"wedge" to enhance its bargaining power); *Worldcare Clinical, Inc. v. Bracco*

*Diagnostic, Inc.*, No. 053218, 2007 WL 2367642, at *4 (Mass. Super. Ct. July 23, 2007)

("Stringing someone along with false promises of payment to induce further performance

. . . is a classic 93A violation.")  Plaintiffs do not allege that Defendants simply breached

the Purchase Agreement and Final Letter Agreement.  Instead, Plaintiffs allege that

Defendants entered into those agreements, never intending to carry out the terms therein,

but with the intent to string Plaintiffs along in order to coerce Plaintiffs to reduce the

purchase price and/or include more land in the deal.  These allegations are sufficient to

state a breach of good faith and fair dealing claim under the Act.

### B.    Plaintiffs' Fraud Claim (Count III)

Defendants ask the Court to dismiss Plaintiffs' common law fraud claim,

contending that under Michigan law the claim is barred by the integration clause in

Plaintiffs' and EIPC's Purchase Agreement.  Defendants argue that the integration clause

bars Plaintiffs from reasonably relying on an allegedly false promise made outside the

terms of the parties' written agreement.  The Court finds, however, that Massachusetts

rather than Michigan law governs Plaintiffs' fraudulent inducement claim and that under

Massachusetts law such a claim is not barred by the integration clause.[2]

---

[2]Apparently unsure of whether Plaintiffs are alleging fraudulent inducement or
fraudulent performance, Defendants argue that if Plaintiffs are claiming fraudulent

As provided earlier, the integration clause in the Purchase Agreement states that

"[i]ssues arising under this Agreement which do not relate to an Individual Real Property

shall be construed under and in accordance with the laws of the Commonwealth of

Massachusetts." (Defs.' Mot., Ex. A at 21.) The Court finds that the scope of this choice

of law provision is sufficiently broad to cover Plaintiffs' fraudulent inducement claim.

*See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 363 (6th Cir. 1993); *Moses v.*

*Bus. Card Express, Inc.*, 929 F.2d 1131, 1139-40 (6th Cir. 1991). In *Banek*, the Sixth

Circuit held that the choice of law provision in the parties' agreement applied to the

plaintiff's fraud claims, reasoning: "Had these claims only been tangentially related to the

franchise relationship, we would be much more inclined to find the choice of law

provision not applicable. The claims of fraud and misrepresentation that plaintiff has

asserted here are directly related to the franchise agreement." 6 F.3d at 363. The court

reached a similar result in *Moses*, explaining:

> The plaintiffs are not asserting a noncontractual claim or one
> that arose incidentally out of the contractual relationship.
> Rather, they are seeking to avoid enforcement of the contract
> itself. They put the validity of the contract at issue, and such
> a claim would appear to be encompassed by the language,
> "This Franchise and License Agreement . . . shall be governed
> by the laws of the State of Michigan."

929 F.2d at 1140.

Although they are not seeking to avoid enforcement of their contracts with EIPC,

_____

performance, such a claim also is barred. Plaintiffs do not respond to this argument and
the Court therefore presumes that they only are alleging fraud in the inducement.

15

Plaintiffs are challenging the conduct of Defendants which Plaintiffs assert induced them to enter into the Purchase Agreement and Final Letter Agreement. Moreover, like the plaintiffs' fraud claims in *Banek* and *Moses*, Plaintiffs' fraud claim arises from and is "directly related to" those contracts. The integration clause encompasses "[i]ssues arising under [the Purchase Agreement]" and thus its scope is broad enough to encompass Plaintiffs' fraud claim.

Under Massachusetts law, "the settled rule of law is that a contracting party cannot rely upon [a merger or integration clause] as protection against claims based upon fraud or deceit." *Sound Techniques, Inc. v. Hoffman*, 737 N.E.2d 920, 924 (Mass. App. Ct. 2000) (citing *Bates v. Southgate*, 31 N.E.2d 551, 558 (1941)). In *Bates*, the Supreme Judicial Court of Massachusetts provided the following rationale for this rule:

> As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud. In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. No one advocates a return to outworn conceptions. The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices. In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. . . .

31 N.E.2d at 558. As the *Sound Techniques* court interpreted *Bates*, intentional misconduct justifies judicial intrusion upon contractual relationships in order to prevent

16

the wrongdoer from securing contractual benefits for which he had not bargained; whereas such intrusion is not warranted where only a negligent misrepresentation is alleged:

> To ignore a merger clause and allow recovery for a negligent misrepresentation does little to promote honesty and fair dealing in business relationships. An individual who makes negligent misrepresentations has honest intentions but has failed to exercise due care. . . . As we read *Bates v. Southgate* . . . it is intentional misconduct that justifies judicial intrusion upon contractual relationships in order to prevent the wrongdoers from securing contractual benefits for which he had not bargained.

737 N.E.2d at 926.

In the present case, Plaintiffs allege that they agreed to the Purchase Agreement and Final Letter Agreement as a result of Defendants' fraud and deceit. Based on the Massachusetts law set forth above– which this Court has concluded governs Plaintiffs' fraud claim– Plaintiffs can present parol evidence to support this claim despite the integration clause in the parties' agreement.

## C. Plaintiffs' Breach of Contract Claim (Count IV)

Defendants contend that the liquidated damages clause in the Purchase Agreement limits Plaintiffs' recovery for EIPC's alleged breach to the escrow deposit and that Plaintiffs' failure to assert a claim in their complaint to the escrow deposit and include the escrow agent as a party defendant precludes their breach of contract claim.[3] The Purchase

---

[3]Defendants appear to concede that Plaintiffs are entitled to the $200,000 escrow deposit and they indicate that they will instruct the escrow agent to tender the deposit to

Agreement between Plaintiffs and EIPC contains the following liquidated damages

provision:

> 11.2 <u>Buyer Default</u>.  In the event all of the conditions to
> Closing . . . have been satisfied and Buyer defaults in its
> obligation to close hereunder, Seller shall be entitled to
> receive the Escrow Deposit as liquidated damages in lieu of
> all other remedies available to Seller at law or in equity for
> such default.  Seller and Buyer agree that the damages
> resulting to Seller as a result of such default by Buyer as of
> the date of this Agreement are difficult or impossible to
> ascertain and the liquidated damages set forth in the preceding
> sentence constitute Buyer's and Seller's reasonable estimate
> of such damages.

(Defs.' Mot., Ex. A at 19.)

Under Michigan and Massachusetts law, a liquidated damages clause in an

agreement is enforceable "when, at the time the agreement was made, potential damages

were difficult to determine and the clause was a reasonable forecast of damages expected

to occur in the event of a breach."  *TAL Fin. Corp. v. CSC Consulting, Inc.*, 844 N.E.2d

1085, 1093 (Mass. 2006) (citing *Kelly v. Marx*, 705 N.E.2d 1114, 1115 (Mass. 1999)); *see*

*also Curran v. Williams*, 352 Mich. 278, 89 N.W.2d 602, 604 (1958); *Moore v. St. Clair*

*County*, 120 Mich. App. 335, 328 N.W.2d 47, 49-50 (1982).  Claiming that the liquidated

damages provision was not a reasonable estimate of the actual damages that they suffered

as a result of Defendants' breach, Plaintiffs contend that the liquidated damages clause in

---

Plaintiffs if the Court dismisses the breach of contract claim, there is a final judgment,
and Plaintiffs do not appeal.  (Defs.' Br. in Supp. of Mot. at 20 n.7.)  Defendants ask the
Court that if Plaintiffs' breach of contract claim is not dismissed, that the claim be limited
to the $200,000 escrow deposit.  (*Id*. n.8.)

the Purchase Agreement is not enforceable. According to Plaintiffs, the $200,000 sum provided for in the liquidated damages provision is grossly disproportionate to the damages Plaintiffs actually suffered as a result of radical changes to the parties' agreement (i.e. the properties being purchased and the purchase price) and Defendants' delaying of the transaction. The Supreme Judicial Court of Massachusetts, however, has specifically rejected the approach Plaintiffs employ to argue that the damages agreed to in the liquidated damages provision was not a reasonable forecast of damages and therefore that it is not enforceable.

In *Kelly v. Marx*, the Court held that the enforceability of a liquidated damages clause is to be tested by analyzing the circumstances *at contract formation*– the prospective or "single look" approach– rather than the circumstances when the breach occurs– the "second look" approach. 705 N.E.2d 1114, 1116 (Mass. 1999). Pursuant to the former approach, "[l]iquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' *made at the time of contract formation*." *Id*. at 1116 (emphasis added). In other words, it is not the actual damages suffered by the non-breaching party that is compared to the liquidated damages to which the parties agreed but rather the reasonable estimate of the actual damages that the parties made when they formed their contract. *See also TAL Financing Corp. v. CSC Consulting, Inc.*, 844 N.E.2d 1085, 1093 (Mass. 2006) (concluding that the defendant carried its burden of establishing that the "[liquidated] provision called for damages that were 'grossly disproportionate' to a reasonable estimate of anticipated damages *at the time the*

19

*schedules were executed*.")

In *Kelly*, the Supreme Judicial Court of Massachusetts provided the following

reasoning for using the "single look" instead of the "second look" approach:

> This approach most accurately matches the expectations of
> the parties, who negotiated a liquidated damage amount that
> was fair to each side based on their unique concerns and
> circumstances surrounding the agreement, and their individual
> estimate of damages in event of a breach . . .
> . . .
> . . . The parties agreed to the extent of their damages when
> they agreed on a liquidated damages clause. "The proper
> course is to enforce contracts according to their plain meaning
> and not to undertake to be wiser than the parties, and therefore
> that in general when the parties say that a sum is payable as
> liquidated damages they will be taken to mean what they say
> and will be held to their word." *Guerin v. Stacy*, 175 Mass.
> 595, 597, 56 N.E.2d 892 (1900) (Holmes, C.J.)

*Id*. at 1117. In that case, the Court specifically rejected the argument that Plaintiffs make

here for finding the liquidated damages provision unenforceable– i.e., that unexpected

changes in a real estate transaction resulted in greater damages to the seller as a result of

the buyer's default:

> "The parties could not know what delays might ensue, what
> might occur in the real estate market, or how a failed sale
> might affect the seller's plans. Real estate purchase and sale
> agreements are precisely the type of contracts that are
> amenable to liquidated damages provision."

705 N.E.2d at 1117 (quoting *Watson v. Ingram*, 124 Wash. 2d 845, 851-52, 881 P.2d 247

(1994)). Thus this Court concludes that the liquidated provision in Plaintiffs' and EIPC's

Purchase Agreement is enforceable.

It does not necessarily follow, however, that Plaintiffs' breach of contract claim must be dismissed because the liquidated damages clause is enforceable. Rather, the enforceability of that clause only leads the Court to find that Plaintiffs' damages for any breach of contract must be limited to the amount set forth in that provision. The Court does not believe that Plaintiffs' failure to name the escrow agent as a party alters this result.

**IV.     Conclusion**

For the reasons set forth above, the Court concludes that the claims alleged in Plaintiffs' complaint do not fail to state a claim upon which relief may be granted.

Accordingly,

**IT IS ORDERED**, that Defendants' motion to dismiss is **DENIED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Mahesh K. Nayak, Esq.
Linda M. Watson, Esq.
Stephanie M. Zimmerman, Esq.
Kaveh Kashef, Esq.
I.W. Winsten, Esq.
Michael P. Hindelang, Esq.